Mark B. HARMON, et al.

v.

Richard L. THORNBURGH, Attorney General of the United States, et al., Appellants.

No. 88–5265.

United States Court of Appeals, District of Columbia Circuit.

Argued December 15, 1988.

Decided June 30, 1989.

Rehearing and Rehearing En Banc Denied Sept. 1, 1989.

John R. Bolton, Asst. Atty. Gen., with whom Jay B. Stephens, U.S. Atty., and Leonard Schaitman, Atty. Dept. of Justice, Washington, D.C., were on the brief, for appellants.

Stephen H. Sachs, with whom Carl Willner, Arthur B. Spitzer and Elizabeth Symonds Washington, D.C., were on the brief, for appellees.

Before WALD, Chief Judge, and ROBINSON and SILBERMAN, Circuit Judges.

Opinion for the court filed by Chief Judge WALD.

Opinion concurring in part and dissenting in part filed by Circuit Judge SILBERMAN.

WALD, Chief Judge:

Appellants Richard L. Thornburgh, *et al.*, on behalf of the United States Department of Justice ("DOJ" or "Department"), appeal from a permanent injunction issued by the district court. That injunction, as subsequently modified by this court, forbade DOJ to implement a random urinalysis drug-testing program covering three categories of Department employees: prosecutors in criminal cases, employees with access to grand jury proceedings, and personnel holding top secret national security clearances. We conclude that intervening decisions of the United States Supreme Court require that the injunction be modified to permit the testing of employees holding top secret clearances. We believe, however, that DOJ has failed to justify its requirement that all workers within the other two categories must submit to random drug testing. We therefore affirm the trial court's judgment as it pertains to these employees.

## I. FACTS

### A. *The Testing Program*

On September 15, 1986, President Reagan issued Executive Order No. 12,564,

which called for various measures designed to create a "drug-free Federal workplace." 51 Fed.Reg. 32,889 (September 17, 1986). That order required, *inter alia*, that "[t]he head of each Executive agency shall establish a program to test for the use of illegal drugs by employees in sensitive positions." *Id.* at 32,890. Pursuant to the Executive Order, the "Department of Justice Drug–Free Workplace Plan" (the "DOJ Plan") was issued on September 25, 1987, and amended on December 17, 1987. On June 27, 1988, DOJ issued the "Department of Justice Drug–Free Workplace Program for the Offices, Boards and Divisions," OBD 1792.1 (the "OBD Plan"). On the same day, the Department notified its employees that random drug testing could begin as soon as 60 days thereafter.

Under the OBD Plan, five categories of DOJ employees in "sensitive" positions may be subjected to random drug testing.[1] These categories include (1) "[a]ll incumbents currently authorized to have access to top secret classified information in accordance with Executive Order 12356"; (2) "[a]ll attorneys responsible for conducting grand jury proceedings and all personnel deemed necessary to assist such attorneys in the performance of their duties"; (3) "[a]ll incumbents serving under Presidential appointments"; (4) "[a]ll incumbents whose assigned position duties include the prosecution of criminal cases"; and (5) "[a]ll incumbents whose assigned position duties include maintaining, storing or safeguarding a controlled substance...." OBD Plan at 6 (J.A. 307). Under the OBD Plan, testing is to be conducted for marijuana, cocaine, opiates, amphetamines, and phencyclidine (PCP). *Id.* at 7 (J.A. 308).

An employee selected for random testing will be notified on "the same day, preferably within two hours, of the scheduled test-ing." DOJ Plan at 18 (J.A. 670). The Department's procedures for obtaining and testing urine specimens are governed by the "Mandatory Guidelines for Federal Workplace Drug Testing Programs" issued by the Department of Health and Human Services (the "HHS Guidelines"). *See* 53 Fed.Reg. 11,970 (April 11, 1988). After arriving at the test site, the employee will present photographic identification and will remove any outer garment such as a coat or jacket. The individual will be supervised by a monitor of the same gender, but will be allowed to urinate within a stall or partitioned area. The toilet water will be tinted with a bluing agent to ensure that the water is not used to adulterate the specimen. After the employee has furnished a specimen, the monitor will inspect the sample to ascertain that a sufficient volume is present, and that the sample is of normal color and temperature.

The laboratory to which specimens are sent will first employ an immunoassay test; any sample identified as positive will then be tested using gas chromatography/mass spectrometry (GC/MS) techniques. If this second test confirms the positive result, a Medical Review Officer shall "review and interpret" the test, "examin[ing] alternate medical explanations for any positive test result." 53 Fed.Reg. 11,985. Before verifying a positive result, the Officer must allow the employee an opportunity to discuss the test.[2] If the Officer verifies the positive result, the employee will be removed from his sensitive position and will be subject to disciplinary proceedings. Possible penalties range from a reprimand to dismissal. *See* Declaration of Joseph A. Norris III at 15 (J.A. 468).[3]

B. *This Litigation*

The plaintiffs in this case include 38 attorneys, three paralegals, and one econo-

---

1. The OBD Plan also provides for applicant testing; probationary employee testing; reasonable suspicion testing; testing following an accident or unsafe practice; voluntary testing; and testing as part of or as a follow-up to counseling or rehabilitation. *See* OBD Plan at 6 (Joint Appendix ("J.A.") 307). Only the requirement of random testing is at issue in this case.

2. The employee might, for instance, attempt to demonstrate that the positive test result had been caused by her use of legally prescribed medication.

3. Dismissal is required after a second finding of illegal drug use. *See* Norris Dec. at 15 (J.A. 468).

mist in various divisions of the Department of Justice. Plaintiffs all occupy positions which have been designated for, or may be subject to, random drug testing. They filed suit on June 28, 1988, one day after the issuance of the OBD Plan. Their complaint requested that the district court declare the DOJ and OBD Plans to be unconstitutional; that it enjoin defendants from implementing drug testing under the Plans; and that it award costs and attorneys' fees. *See* Complaint at 20–21 (J.A. 28–29).

On July 29, 1988, the district court issued a preliminary injunction against the implementation of the OBD Plan. *Harmon v. Meese*, 690 F.Supp. 65 (D.D.C.1988). The court noted that compulsory urinalysis, under our circuit's precedents, constituted a "search" governed by the fourth amendment.[4] *Id.* at 67. The trial judge also noted the absence of any documented drug problem within the Department. *Id.* at 68. The court concluded that the OBD Plan was unreasonable, and therefore proscribed by the Constitution, "because there is no nexus between fitness for duty, security and integrity on the one hand, and compulsory random urinalysis drug testing on the other, where no drug problem is believed to exist." *Id.* The court therefore ordered that "defendants are enjoined from implementing mandatory random drug testing by urinalysis in the Offices, Boards and Litigating Divisions of the Department of Justice under the 'Department of Justice Drug–Free Workplace Plan.'" *Id.* at 70. On the unopposed motion of the Department, the district court ordered that the preliminary injunction be made permanent. *Id.* On August 5, 1988, DOJ filed a notice of appeal.

In its brief to this court, the Department pointed out that none of the plaintiffs was a Presidential appointee, nor was any plaintiff responsible for maintaining, storing, or safeguarding controlled substances. *See* Brief for Thornburgh at 26 n. 19, 32 n. 24. Therefore, DOJ argued, the plaintiffs lacked standing to challenge the OBD Plan insofar as it mandated the random testing of these categories of employees. On December 16, 1988, the day after oral argument, this court ordered that the injunction be modified to permit the random testing of workers in these categories. At present, therefore, the controversy is limited to the Department's requirement of random drug testing for federal prosecutors, workers with access to grand jury proceedings, and employees holding top secret national security clearances.

C. *Intervening Supreme Court Decisions*

Our disposition of this case is guided—and, to a large extent, controlled—by the Supreme Court's recent decisions in *National Treasury Employees Union v. Von Raab*, —— U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), and *Skinner v. Railway Labor Executives' Association*, —— U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). In *Von Raab*, the Court upheld the requirement that workers seeking transfer or promotion to specified positions within the United States Customs Service must undergo urinalysis. In *Skinner*, the Court sustained Federal Railroad Administration regulations which required blood and urine tests for train workers in the event of certain types of railway accidents. These regulations also permitted, but did not require, the testing of employees who had been found to violate certain safety rules.

■ From these decisions certain general principles may be gleaned. Urinalysis, if compelled by the government, is a "search" subject to the restrictions of the fourth amendment. *See Skinner*, 109 S.Ct. at 1412–13; *Von Raab*, 109 S.Ct. at 1390. However, individualized suspicion of a particular employee is not required by the Constitution. *See Skinner*, 109 S.Ct. at 1417; *Von Raab*, 109 S.Ct. at 1390. Nor is it necessary that a documented drug problem exist within the particular workplace at issue. *See Von Raab*, 109 S.Ct. at 1395 ("The mere circumstance that all but a few

---

**4.** *See Jones v. McKenzie*, 833 F.2d 335, 338 (D.C. Cir.1987), *vacated sub nom. Jenkins v. Jones*, —— U.S. ——, 109 S.Ct. 1633, 104 L.Ed.2d 149 (1989); *National Federation of Federal Employees v. Weinberger*, 818 F.2d 935, 942 (D.C.Cir. 1987).

of the employees tested are entirely innocent of wrongdoing does not impugn the program's validity."). Rather, "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab*, 109 S.Ct. at 1390; *accord, Skinner*, 109 S.Ct. at 1413–14.

The Supreme Court recognized three governmental interests which might, in appropriate circumstances, be sufficiently compelling to justify mandatory testing even in the absence of individualized suspicion. First, the government's interest in maintaining the integrity of its workforce was held to justify the testing of all Customs Service employees seeking transfer to positions involving the interdiction of illegal drugs. *See Von Raab*, 109 S.Ct. at 1393. Second, the suspicionless testing of train workers, or of Customs Service employees who carry firearms, was upheld as a legitimate means of enhancing public safety. *See Skinner*, 109 S.Ct. at 1419 ("Employees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences."); *Von Raab*, 109 S.Ct. at 1393. Finally, the Court stated that the government's "compelling interest in protecting truly sensitive information," *Von Raab*, 109 S.Ct. at 1396, could under some circumstances furnish an adequate justification for the suspicionless testing of individuals whose jobs would involve access to classified materials.

Following the issuance of these decisions, we requested that the parties file supplemental briefs addressing the relevance of *Skinner* and *Von Raab* to our disposition of the present case. The plaintiffs contend that neither of the Supreme Court's decisions authorizes the testing program at issue here, and that the district court's injunction should therefore be maintained. DOJ, by contrast, argues that its testing program is quite similar to those upheld in *Skinner* and *Von Raab* and that the injunction should therefore be vacated in its entirety.

## II. ANALYSIS

### A. *Skinner and Von Raab*

■ Our analysis centers on the two decisions recently issued by the Supreme Court. Of the two, *Von Raab* is more closely on point. In *Skinner*, the Court upheld regulations under which drug testing would be contingent on an event—such as a train accident or a rule violation by a particular employee—which furnished an indication that some dereliction of duty had occurred. Although post-accident testing requires no individualized suspicion of any particular employee, it at least requires concrete evidence that events have not gone as planned. The testing program upheld in *Von Raab*, by contrast—like the program at issue here—included no such requirement. Moreover, *Skinner* relied entirely on a single governmental interest: the protection of the public from immediate threats to physical safety. Portions of *Von Raab* relied on that interest, but the Court also discussed the circumstances under which the state's need to ensure the integrity of its workforce, or the necessity of preventing the disclosure of confidential information, might justify the testing of public employees.

Application of *Von Raab* to the facts of the present case presents a delicate task. The *Von Raab* majority made no effort to articulate an analytical rule by which legitimate drug-testing programs could be distinguished from illegitimate ones. It simply weighed individual privacy interests against the government's policy objectives, enumerating several factors that it deemed relevant in performing this balancing process. The Court did not, however, indicate whether it deemed the case a close one, in the sense that minor variations in the facts would have tipped the balance in the other direction.[5] Nor did it indicate which (if

---

**5.** *Von Raab* was decided by a 5–4 vote, and in that sense was a close case. It is not clear,

any) of the relevant factors would be *essential* to a constitutional testing plan.

In their supplemental brief, appellees draw our attention to two basic distinctions between the plan at issue here and the testing program upheld in *Von Raab*. One distinction involves the differing working environments of DOJ and Customs Service employees. The Court in *Von Raab* noted that "[d]etecting drug impairment on the part of employees can be a difficult task, especially where, as here, it is not feasible to subject employees and their work-product to the kind of day-to-day scrutiny that is the norm in more traditional office environments." 109 S.Ct. at 1395. DOJ employees, by contrast, work in "traditional office environments," in which drug use is, presumably, more easily detected by means other than urine testing. Though this is surely one element to be weighed in the balance, the *Von Raab* Court gave no indication that it deemed this factor to be one of overriding significance.

Appellees also point out that the OBD Plan challenged here involves *random* testing; the Customs Service required testing only for employees seeking transfer or promotion to a covered position. While the Customs plan mandated testing on a single occasion, a DOJ employee could, at least in theory, be subjected to repeated testing over the course of his career. More importantly, under the Customs program an individual's obligation to undergo testing can be triggered only by her own decision to alter her status within the Service. A DOJ worker in a sensitive position, by contrast, may decline to be tested only if she is willing to relinquish a job she already holds.[6]

The invasion of privacy occasioned by the OBD Plan might therefore be regarded as different in kind from the intrusion at issue in *Von Raab*. And a coherent theory might be constructed which would make this a fundamental distinction. In our view, however, the Supreme Court has not encouraged the construction of such a theory. The Court in *Von Raab* did point out that "[o]nly employees who have been tentatively accepted for promotion or transfer to one of the three categories of covered positions are tested, and applicants know at the outset that a drug test is a requirement of those positions." 109 S.Ct. at 1394 n. 2. The Court's discussion of this point, however, was confined to a footnote; even within this footnote, moreover, it was identified only as one of several factors which, taken together, would "significantly minimize the intrusiveness of the Service's drug screening program." *Id.* Certainly the random nature of the OBD testing plan is a *relevant* consideration; and, in a particularly close case, it is possible that this factor would tip the scales. We do not believe, however, that this aspect of the program requires us to undertake a fundamentally different analysis from that pursued by the Supreme Court in *Von Raab*.

### B. *Governmental Interests*

In its supplemental brief to this court, the Department contends that each of the three governmental interests relied upon by the Court in *Von Raab*—integrity of the workforce, public safety, and protection of sensitive information—furnishes an adequate justification for the OBD Plan. We examine these governmental interests in turn.

---

however, whether any of the five Justices in the majority regarded the Customs Service plan as being near the line separating legitimate from illegitimate drug testing programs.

**6.** *Cf. United States v. Edwards*, 498 F.2d 496, 500–01 (2d Cir.1974) (airport security inspection is rendered less intrusive by the fact that an individual may avoid the search by declining to travel by air).

The Supreme Court has recognized in other contexts that "[d]enial of a future employment

opportunity is not as intrusive as loss of an existing job." *Wygant v. Jackson Board of Education*, 476 U.S. 267, 282–83, 106 S.Ct. 1842, 1851, 90 L.Ed.2d 260 (1986) (plurality opinion). The *Wygant* plurality reasoned that an affirmative action hiring plan is preferable to a plan involving layoffs, because "[t]hough hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose." *Id.* at 282, 106 S.Ct. at 1851.

## 1. Integrity

■ The broadest theory advanced by DOJ at oral argument was that its interest in ensuring the integrity of its workforce would justify the random drug testing of every federal employee. Certainly that theory finds no support in *Von Raab*. The Court there noted that "[u]nlike most private citizens *or government employees in general,* employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity." 109 S.Ct. at 1394 (emphasis added). We do not, of course, question the obvious principle that the government has a legitimate interest in ensuring that its employees obey the law. The issue is whether that interest is sufficiently compelling to justify a search. *Von Raab*, it seems to us, suggests that federal employment alone is not a sufficient predicate for mandatory urinalysis.[7]

■ Nor is it sufficient in our view that DOJ employees are, broadly speaking, engaged in law enforcement. Again, it is beyond dispute that those who enforce the law have a particular obligation to obey it. *Von Raab*, however, suggests that the government may search its employees only when a clear, direct nexus exists between the nature of the employee's duty and the nature of the feared violation. The Court emphasized the particular dangers inherent in drug use by employees directly engaged in drug interdiction. No such nexus is present in this case. The fact that a DOJ employee is a federal prosecutor, has access to grand jury proceedings, or holds a security clearance in no way identifies her as an employee responsible for the enforcement of federal narcotics laws.

In its supplemental brief, DOJ argues that "[i]t would make little sense to say that the 'national interest in self protection' vis-a-vis illegal drug trafficking applies to the Customs agent who makes the arrest but not to the Justice Department prosecutor who handles the matter from that point on." Supplemental Brief for Thornburgh at 5 n. 5. In discussing the integrity rationale, the Supreme Court emphasized that the "national interest in self protection could be irreparably damaged if those charged with safeguarding it were, because of their own drug use, unsympathetic to their mission of interdicting narcotics." *Von Raab*, 109 S.Ct. at 1393. Certainly this reasoning applies with equal force to the DOJ attorney who prosecutes federal drug cases. The Court also noted, however, that Customs officials engaged in drug interdiction "may be tempted not only by bribes from the traffickers with whom they deal, but also by their own access to vast sources of valuable contraband seized and controlled by the Service." *Id.* at 1392. No such concern is present here.[8] The analogy suggested by DOJ must therefore be regarded as substantial but imperfect.

It seems quite possible that the Department might constitutionally fashion a random drug-testing program for all DOJ employees having substantial[9] responsibility for the prosecution of federal drug offenders. We need not resolve that question now, however, since DOJ has not, as yet,

---

7. The *Von Raab* Court remanded for further proceedings to determine which Customs workers could be tested based upon their access to "sensitive" materials. This additional inquiry would of course be superfluous if *all* public employees could be subjected to testing on the integrity rationale.

8. Pursuant to our modification of the district court's injunction, DOJ is permitted to test employees "whose assigned position duties include maintaining, storing or safeguarding a controlled substance." *See* OBD Plan at 7 (J.A. 308). If any federal prosecutors have access to contraband held by DOJ, they could presumably be subjected to testing based upon their membership in this category of employees.

9. Judge Silberman argues that "it is hard to imagine a principled constitutional line that could be drawn between" employees having "substantial" and "insubstantial" responsibility for the prosecution of drug offenses. *See* Silberman op. at 498. Certainly any standard developed by the courts to determine substantiality will be imprecise and thus, to some degree, "unprincipled." That imprecision, however, seems not merely consistent with, but in fact required by, the Supreme Court's opinion in *Von Raab*. The Supreme Court has quite clearly eschewed an approach to drug testing based on bright lines and clean analytic principles, and has instead mandated case-by-case balancing of individual and societal interests.

fashioned such a program.[10] The government has not so far identified a separate category of drug prosecutors, but instead has required that *all* employees who prosecute criminal cases must undergo random testing. We do not believe, however, that under *Von Raab* an attorney who prosecutes antitrust or securities fraud cases can plausibly be analogized to a customs agent whose job is drug interdiction. We therefore conclude that the government's integrity interest cannot justify the testing of any one of the three broad categories at issue here.

### 2. Public Safety

■ In both *Skinner* and *Von Raab*, the Court held that the government's legitimate interest in protecting public safety could justify the suspicionless drug-testing of some employees. The Department contends that the duties of workers covered by the OBD Plan raise comparable public safety concerns. We do not agree.

Certainly a blunder by a Justice Department lawyer may lead, through a chain of ensuing circumstances, to a threat to public safety. That sort of indirect risk, however, is wholly different from the risk posed by a worker who carries a gun or operates a train. The Supreme Court in *Von Raab* emphasized that

> Customs employees who may use deadly force plainly "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." [quoting *Skinner*, 109 S.Ct. at 1419] We agree with the Government that the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force.... Because successful performance of their duties depends uniquely on their judgment and dexteri-

ty, those employees cannot reasonably expect to keep from the Service personal information that bears directly on their fitness.

109 S.Ct. at 1393, 1394.

The public safety rationale adopted in *Von Raab* and *Skinner* focused on the *immediacy* of the threat. The point was that a single slip-up by a gun-carrying agent or a train engineer may have irremediable consequences; the employee himself will have no chance to recognize and rectify his mistake, nor will other government personnel have an opportunity to intervene before the harm occurs. *Von Raab* provides no basis for extending this principle to the Justice Department, where the chain of causation between misconduct and injury is considerably more attenuated.

### 3. "Sensitive" Information

■ The government's supplemental brief places primary emphasis on the governmental interest in protecting confidential information. The Customs program at issue in *Von Raab* mandated drug testing for those seeking promotions to positions where they would be required to handle classified materials. The Court stated: "We readily agree that the Government has a compelling interest in protecting truly sensitive information.... We also agree that employees who seek promotions to positions where they would handle sensitive information can be required to submit to a urine test under the Service's screening program." 109 S.Ct. at 1396, 1397. The Court did not define the contours of "truly sensitive" information (although the Customs regulations themselves spoke of "classified" materials).

■ Whatever "truly sensitive" information includes, we agree that it encompasses top secret national security information.[11]

---

**10.** We believe that the burden should fall on DOJ to redefine a new category of employees eligible for random urinalysis, rather than on this court to identify the individuals within the agency's current broad categories who may be subjected to testing. *See infra*, pp. 492–96.

**11.** Executive Order No. 12,356 provides that national security information shall be classified at one of three levels: "top secret," "secret," or "confidential." Top secret materials are of the highest order of confidentiality: this designation applies only to "information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to

We therefore hold that the injunction must be dissolved as to the third category of employees. There is admittedly some merit to the plaintiffs' contention that "[i]t is reasonable to expect that many individuals holding security clearances do not regularly see or have never actually seen any top secret information, but were merely given such clearances because their duties might at some point call for review of such material." Supplemental Brief for Harmon at 9. On balance, though, we think it would not be desirable to ask the Department to draw distinctions, within the class of attorneys holding top secret security clearances, between attorneys who do and those who do not deal with such materials on a regular basis. The whole point of granting top secret security clearances in advance is to provide flexibility, to ensure that employees can be given access to top secret materials as soon as the need arises. If submission to drug testing can legitimately be made a requirement for access to top secret materials—and *Von Raab* indicates as much—then the government may properly make testing a requirement for holding a top secret security clearance.

A different result is not compelled by the fact that the OBD Plan, unlike the Customs program, involves the *random* testing of employees who work within a "traditional office environment." These factors are relevant to our analysis, and in a borderline case they might tip the scales. But whatever the precise scope of "truly sensitive" information, it seems evident that top secret national security materials lie at its very core. We therefore believe that the government's interest in protecting these materials outweighs the employees' privacy interest, despite the fact that the OBD testing program is somewhat more intrusive than the plan upheld in *Von Raab.*

■ We do not believe, however, that the government's interest in preserving all its secrets can justify the testing of all federal prosecutors or of all employees with access to grand jury proceedings. We recognize that every employee within the three categories will have access to information which he is duty-bound not to divulge. But whatever the precise contours of "truly sensitive" information intended by the *Von Raab* Court, we believe that the term cannot include *all* information which is confidential or closed to public view. A very wide range of government employees—including clerks, typists, or messengers—will potentially have access to information of this sort. Moreover, the obligation to maintain confidentiality lies at the heart of every lawyer's ethical responsibility. The fact that the employees covered by the Department's drug testing regulations deal with confidential information therefore does not distinguish them from private attorneys, or from government employees generally.

The Supreme Court in *Von Raab* did not define precisely what categories of information would be sufficiently "sensitive" to warrant mandatory drug testing. It seems to us, however, that the Court gave indications that caution should be used in approving this justification for testing. The principal case cited in support of the proposition that "the Government has a compelling interest in protecting truly sensitive information," 109 S.Ct. at 1396, was *Department of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). *Egan* upheld the denial of a security clearance to an individual who sought a job at a repair facility for nuclear submarines: the information at issue in that case was of the highest order of confidentiality. The *Von Raab* Court, relying in part on *Egan*, agreed in principle that under some circumstances the government's interest in protecting its secrets would be a sufficient predicate for a drug-testing program. At the same time, though, the Court expressed concern as to "whether the Service has defined this category of employees more broadly than necessary to meet the purposes of the Commissioner's directive," 109 S.Ct. at 1397, and remanded for further consideration by the court of appeals. Against this backdrop, we must conclude that the confidentiality rationale cannot justify the testing of all DOJ employees

the national security." 47 Fed.Reg. 14,874 (April 6, 1982).

within the first two broad categories at issue here.

## C. *Remedy*

On remand, the district court is instructed to modify the injunction so as to permit the testing of all employees covered by the OBD Plan who hold top secret national security clearances. We see no basis on which this portion of the injunction may be sustained, since our reading of *Von Raab* leads us to the conclusion that every individual within this category may be subjected to mandatory testing. The other two categories of covered employees present a more difficult question. We believe, for the reasons stated above, that the categories as currently drawn cannot be sustained. Yet we must acknowledge the distinct possibility that some workers within these categories may perform duties so closely tied to the enforcement of federal drug laws that they could constitutionally be required to undergo testing.

 Judge Silberman's view is that this court should determine which employees may and may not constitutionally be subjected to testing, and that we should then instruct the district court to modify the injunction accordingly.[12] Our colleague's approach is grounded in the principle that injunctions issued by federal courts should be no broader than necessary to remedy the violation complained of. *See, e.g., Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir.1985) (noting "the requirement that an injunction must be narrowly tailored to remedy the harm shown"). To the extent that the current injunction proscribes lawful as well as unlawful testing, our colleague argues, it represents a judicial usurpation.

Judge Silberman's argument is not without force. Recent Supreme Court decisions have revealed an increasing willingness to separate valid from invalid applications of overbroad statutes, and to enjoin enforcement only insofar as the statute operates unlawfully. *See, e.g., Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985); *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). If there were some clearly defined subset of federal prosecutors who could plainly be subjected to random testing, and if it were apparent that the Department would wish to test those employees even if it could not test other prosecutors, then there would be little point in retaining the injunction as it applied to that group of workers. In the present case, however, countervailing considerations make us reluctant to decide, at

---

**12.** Our colleague, we would note in passing, is not altogether consistent as to what the proper scope of the injunction should be. His central criticism of our approach is that we have declined to vacate the injunctions as to drug prosecutors; he states that "[t]he injunction, in my view, must be further modified insofar as it prevents drug testing of those Justice Department employees who are engaged in the investigation and prosecution of drug cases." Silberman op. at 500. Other portions of his opinion state, however, that the injunction should be limited to *named plaintiffs, see id.* at 499 n. 3, 500. The Department has never challenged the injunction on this ground, and we need not resolve the question here. We do, however, offer two brief observations on this point.

First, the contention that named plaintiffs alone should be protected by the injunction is distinct from, and in fact quite inconsistent with, the claim that injunctive relief should be limited to employees who do not prosecute drug cases. The two arguments cannot be blurred together simply because both are in some sense attacks on the breadth of the injunction. If injunctive relief is appropriate for named plaintiffs only, then the current injunction would be unlawful even if the Supreme Court in *Von Raab* had held that *no* public employee could be subjected to random urinalysis.

Second, if Judge Silberman's position is correct, then it would seem that the injunction was unduly broad even before *Skinner* and *Von Raab* were issued. Our colleague's approach would suggest that the district court should, at the outset, have issued an injunction applicable only to named plaintiffs. Moreover, it would suggest that this panel was wrong when we modified the injunction to eliminate two of the categories without also modifying it to eliminate non-plaintiffs. Certainly *Von Raab* has changed our conception of *which* employees are similarly situated: drug prosecutors and securities fraud prosecutors, who previously seemed to be similarly situated, now may fall into different categories. But there is nothing in *Von Raab* which addresses the more general question of whether similarly-situated nonplaintiffs should be covered by the injunction in the first place.

this stage of the litigation, precisely which employees may and may not be tested.

Our reluctance stems in part from our obligation to avoid unnecessary or premature constitutional rulings.[13] We simply do not know whether the Department would choose (for example) to test drug prosecutors if it could not test other prosecutors as well,[14] and we are hesitant to decide whether such a plan would be constitutional in the absence of any indication that it will be adopted.[15] Our reluctance is heightened by the absence of any meaningful argument by the parties on this question. Up to this point, the government has argued that all of the employees covered by the plan can be forced to undergo testing; the plaintiffs have argued that none of them can. The parties simply have not joined issue concerning the appropriate course of action in the event that some of these workers are deemed subject to testing while others are not.[16]

▮▮▮ Our disposition of this case is also in keeping with the fundamental principle that agency policy is to be made, in the first instance, by the agency itself—not by courts, and not by agency counsel. When a court finds that an agency regulation is invalid in substantial part, and that the invalid portion cannot be severed from the rest of the rule,[17] its typical response is to vacate the rule and remand to the agency.[18] Courts ordinarily do not attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule.[19] Were we to hold that the cur-

13. *See, e.g., Meredith Corp. v. FCC,* 809 F.2d 863, 870 (D.C.Cir.1987) (court's inquiry is shaped by "our duty to avoid unnecessary constitutional adjudication"); *Ashwander v. TVA,* 297 U.S. 288, 345–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1935) (Brandeis, J., concurring).

14. This problem did not arise in *Von Raab,* since the Customs Service itself had identified a distinct category of agents engaged in drug interdiction.

15. We do not suggest that the agency is permitted to test only those employees who can "plainly" be subjected to testing. *See* Silberman op. at 500. Our point is simply that any ultimate attempt (by either DOJ or the courts) to determine precisely which workers may be tested is likely to involve extremely difficult line-drawing problems. The agency, of course, retains the prerogative of extending its program to the very limit of its constitutional authority. *Ashwander* principles, however, counsel hesitation on the part of the courts: when the location of the constitutional boundary remains in doubt, we should not attempt to define that boundary in advance of the necessity for doing so.

16. The plaintiffs did address this point indirectly in a footnote in their supplemental brief. The plaintiffs acknowledged the possibility that employees who regularly dealt with top secret information might be subjected to testing, but argued that the DOJ testing plan improperly included workers who had received clearances but never actually inspected top secret materials. If this court adopted that analysis, plaintiffs argued, it should not "requir[e] the District Court to perform the burdensome task of assessing the constitutionality of testing employees in each of potentially hundreds or thousands of individual positions for which top secret clearances have been granted, but should retain the injunction against the Department's program as

presently designed." Supplemental Brief for Harmon at 9 n. 10.

17. We do not believe that the same sorts of problems are posed by our decision to permit the testing of employees holding top secret security clearances. Our exclusion of these employees from the injunction—like our earlier modification of the injunction to permit the testing of Presidential appointees and employees whose jobs involve the supervision of drug supplies—admittedly reflects a judgment that the OBD Plan "was not an undifferentiated whole." *See* Silberman op. at 8. Put another way, our treatment of this question reflects a determination that the different categories of employees identified by DOJ are severable from each other. But the decision to sever one discrete regulatory provision from another—by adhering to the lines drawn by the agency itself—is wholly different from an attempt to construct a new category.

18. *See, e.g., Global Van Lines, Inc. v. ICC,* 804 F.2d 1293, 1305 n. 95 (D.C.Cir.1986) ("when an agency committing an error of law has discretion to determine in the first instance how it should be rectified, the proper course is to remand the case for further agency consideration in harmony with the court's holding").

19. We are somewhat perplexed by Judge Silberman's suggestion that the "Department of Justice Drug–Free Workplace Program for the Offices, Boards, and Divisions," OBD 1792.1, is not a "plan" or regulation, *see* Silberman op. at 498–500, and that ordinary principles of administrative law are therefore inapplicable. The DOJ and OBD Plans were official agency documents, scarcely analogous to "a speech by the Attorney General," *id.* at 499. (If the intention to test the Department's employees had been expressed in

rent injunction should not apply to drug prosecutors, we would be drawing a line which the agency itself has never drawn.[20] Moreover, that line would not be self-defining: the district court would be compelled to hear evidence and arguments, and then to determine which individual employees qualified as "drug prosecutors." We think it is more appropriate that any such determination should be made and subsequent identification criteria should be formulated, as an initial matter, by the agency rather than by the court.[21]

In our view, the best course of action at this time is to retain the current injunction against the Department's requirement that all federal prosecutors and all employees having access to grand jury proceedings may be subjected to random urinalysis.

DOJ, of course, remains free to promulgate new, narrower regulations, subject to the review of the district court. This disposition ensures that agency policy will be fashioned, in the first instance, by the agency itself. Moreover, any ultimate judicial pronouncement concerning the precise scope of the Department's testing power will occur within the context of review of a concrete agency policy choice: neither this court nor the district court need address the abstract question of what classification scheme the agency *might* choose to adopt.

For these reasons, we believe that agency reformulation of its policy, not further modification of the injunction by the district court, is the preferable next step in dealing with the overbreadth of the Depart-

such a speech, and if DOJ workers had thereupon filed suit, it might well be contended that their injury was "speculative," that they therefore lacked standing, and that the case was unripe.) The Plans were adopted pursuant to Executive Order 12,564: that Order required that "[t]he head of each Executive agency shall develop a plan for achieving the objective of a drug-free workplace" and that "[t]he head of each Executive agency shall establish a program to test for the use of illegal drugs by employees in sensitive positions." 51 Fed.Reg. 32,890 (September 17, 1986). In order to provide uniformity among executive agency drug-testing programs, Congress has also established standards with which agency testing plans must comply. *See* Section 503 of the Supplemental Appropriations Act of 1987, Pub.L. 100–71, 101 Stat. 391, 468–471, codified at 5 U.S.C. § 7301 note (1987). *See also* DOJ Plan at 1–2 (J.A. 653–54). The DOJ and OBD Plans would appear to be paradigmatic examples of "matter[s] relating to agency management or personnel," *see* 5 U.S.C. § 553(a)(2). As such they are exempt from the *procedural* (notice-and-comment) requirements of the Administrative Procedure Act, *see Stewart v. Smith*, 673 F.2d 485, 496–500 (D.C.Cir.1982). Our *substantive* review of the testing requirements, however, is nevertheless guided by the fundamental principle that the agency, not the court, is responsible for the formulation of policy.

Nor is it especially relevant that this case involves a suit for injunctive relief in district court rather than a petition for review to the Court of Appeals. The Administrative Procedure Act strongly suggests that the two avenues of review are analogous. *See* 5 U.S.C. § 703 ("The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof,

any applicable form of legal action, including actions for ... mandatory injunction ... in a court of competent jurisdiction."). *See also Hameetman v. City of Chicago*, 776 F.2d 636, 640 (7th Cir.1985) ("When an administrative action is judicially reviewable but no statute specifies the route to take to get judicial review, an aggrieved party can bring a suit against the responsible officials in a federal district court under 28 U.S.C. § 1331, the general federal-question statute.... Such a suit resembles an equity suit but is actually a review proceeding rather than an original proceeding."). Finally, this case does not cease to involve review of agency action simply because the underlying claim is constitutional in nature. The Administrative Procedure Act makes clear that judicial review of agency action extends to the consideration of claims that the agency has behaved in a manner "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

**20.** Our point is not (as Judge Silberman suggests) "that a court reviewing an agency action will not entertain arguments not relied upon by the agency," Silberman op. at 499. Our colleague's proposed solution—that the court should define a category of "drug prosecutors" and vacate the injunction as to them—is in our view objectionable not because it invokes a new *argument* to sustain the agency's rule, but because it sustains a rule which the agency has never adopted at all.

**21.** Traditional administrative law principles may also be relevant in addressing the claim that named plaintiffs alone should be protected by the injunction. When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated —not that their application to the individual petitioners is proscribed.

ment's current testing program.[22] We recognize, however, that DOJ has not, as yet, been heard from on this issue. We therefore leave open the possibility that the Department might persuade the district court that further modification of the injunction would be appropriate, even in the absence of new regulations. Should the agency make such a request, however, it should be prepared to explain why such a modification will neither transfer policymaking authority from the agency to the court, nor embroil the court in an abstract or hypothetical dispute.[23]

## D. *Conclusion*

We conclude that all DOJ employees holding top secret national security clearances may constitutionally be required to undergo random urinalysis. The district court should therefore modify the current injunction so as to permit the testing of individuals within this category. The injunction should, however, be maintained insofar as it prohibits the Department from implementing its current plan to test all federal prosecutors and all employees having access to grand jury proceedings. The case is remanded to the district court for further proceedings not inconsistent with this opinion.

*Judgment accordingly.*

SILBERMAN, Circuit Judge, concurring in part and dissenting in part:

## I.

I agree with the majority that the Attorney General may constitutionally implement his drug-testing plan as applied to all employees who hold top security clearances. I also agree that employees covered by

the plan because they have access to grand jury information unrelated to investigation or prosecution of drug offenses may not be tested. Virtually all government employees are privy to *some* confidential information, and if that factor were deemed sufficient to justify drug testing the Supreme Court in *National Treasury Employees Union v. Von Raab,* — U.S. —, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), would have adopted a broader rationale. We judges and lawyers tend to be particularly sensitive to the secrecy of grand jury proceedings, but with regard to the government's interest in preserving confidentiality, it is hard for me to distinguish between a grand jury and, for instance, the Department of Agriculture's annual crop estimates or the Department of Labor's (and Commerce's) monthly consumer price indices. Like the majority, I do not think the Court's conclusion that employees with access to "truly sensitive information" can be tested permits testing of those with access to confidential information, at least on these grounds.

I further believe the majority quite correct in suggesting that under *Von Raab,* the government can test federal prosecutors and their support staff engaged in drug prosecutions. Maj. op. at 491. My reading of *Von Raab* convinces me that the government has the constitutional authority to test all of its employees involved in the investigation and prosecution of drug-related offenses. Central to that conclusion is my appraisal of the government's interest in so doing in light of *Von Raab*'s analysis. The Customs Service personnel involved in *Von Raab* were, to be sure, described by the majority as the "first line of defense," 109 S.Ct. at 1392, and "frontline interdiction personnel," *id.* at 1393,

**22.** We see no reason that agency reformulation of its policy should cause undue delay, especially since the Department's new testing criteria, as noted earlier, *see supra* n. 19, would not be subject to the notice-and-comment requirements of the Administrative Procedure Act.

**23.** It is possible that DOJ will argue on remand that the injunction should apply only to named plaintiffs, not to similarly-situated agency employees. *See supra,* n. 12. Though we do not

foreclose this argument, we do note that nothing prevented the Department from advancing this contention on its initial appeal. If DOJ seeks on remand to attack the injunction on this basis, it must rebut the presumption that an argument not raised on an initial appeal will thereafter be deemed waived. *See Northwestern Indiana Telephone Co., Inc. v. FCC,* 872 F.2d 465, 470 (D.C.Cir.1989); *Laffey v. Northwest Airlines,* 740 F.2d 1071, 1089–90 (D.C.Cir.1984).

who are "often exposed to th[e] criminal element and to the controlled substances they seek to smuggle into the country," *id.* at 1392. It might be thought, therefore, that prosecutors and their support staff, who are somewhat more removed from direct contact with the criminal element, are in less danger of contamination. But I think the key sentence in *Von Raab* is the following:

This national interest in self-protection could be irreparably damaged if those charged with safeguarding it were, because of their own drug use, unsympathetic to their mission of interdicting narcotics.

*Id.* at 1393.

Justice Scalia, in a strong dissent, argued that the government's true interest—upon which he accused the majority of being unwilling to rely—was mere symbolism rather than concern that any significant number of Customs Service officials would be corrupted through contact with illegal drug purveyors. Although the majority did not respond to the dissent—which makes it more difficult for us to understand the scope and rationale of the opinion—it seems to me Justice Scalia must have a point, although not quite so broad as he contends.

The majority clearly accepted the government's argument that its efforts to stop drug trafficking and use in the United States were best analogized to a war; the adoption of its metaphors ("front-line interdiction personnel" and "first line of defense") makes that quite obvious. In time of war the morale of a nation's civilians is almost as important as that of its fighting troops. Any indication that members of the armed forces are sympathetic to the enemy, or to practices characteristic of the enemy, is so destructive of both military and civilian morale that it cannot be tolerated. Can one imagine, for instance, the U.S. government remaining indifferent during World War II to an open display of fealty to Nazi tenets or symbols on the part of even a single soldier? Any such development, no matter how isolated, would have been perceived as enormously dangerous—much more so than if it had occurred (which it occasionally did) among the civilian population. The American people expect that those entrusted with the responsibility of fighting our nation's enemies do so with absolute loyalty and full commitment to the struggle. Anything less would risk the nation's survival. Thus, even an isolated departure from that commitment threatens to have a disproportionate negative impact on the nation's morale.

The analogy may not be precise, but the federal government's efforts to contain and beat back the drug scourge that affects our society depend importantly on convincing all Americans that drug use is as much a danger to them and to our country as is an external enemy. Obviously, millions of Americans are not yet persuaded. That appears to explain why the Supreme Court—notwithstanding the lack of evidence that a substantial number of Customs Service personnel use drugs—approved the drug-testing program. If even one Customs agent were discovered to be a drug user, the ensuing publicity, both within the agency and without, would likely have a far more corrosive impact on the government's effort to fight drug use than would the conduct of that one agent.

Federal prosecutors and their support staff engaged in drug prosecution are no less committed to the war against drugs than are the Customs Service personnel. They are, in this sense, drug warriors. The down-side risk of having even one of them discovered as an apostate, as a traitor who consorts with and aids the government's and society's mortal enemy, is, as with the soldier in wartime, disproportionately large. For that reason, I think that all those employees in the Justice Department whose responsibilities are related to drug prosecution may be tested under the Attorney General's program.[1]

Nor do I think it matters, as the majority suggests, how "substantial" or how frequent an employee's involvement is in the

---

1. I confess to grave doubts that the criminal law is the most effective way of dealing with our drug problem—but that question is, of course, not for judges to decide.

investigation and prosecution of drug crimes. Just as the Court in *Von Raab* thought testing of Customs Service employees was constitutionally reasonable even if very few had even manifested any drug corruption, so I think that it cannot matter constitutionally whether an attorney is spending five or fifty percent of his working time prosecuting drug cases.[2] If, as I read *Von Raab*, the real government interest is the avoidance of any indication that a government employee enlisted in the war against drugs is himself corrupted by the evil sought to be contained, it matters not whether that employee is a part-time or full-time warrior. The harm to the government caused by a defection is virtually the same in either event. And, of course, it is hard to imagine a principled constitutional line that could be drawn between the two. As with those carrying top-secret clearance —whom the majority permits to be tested regardless of their actual access to classified materials, *see* Maj. op. at 491—the Justice Department needs the freedom and flexibility to deploy attorneys and support staff within those criminal investigations and prosecution units that, *inter alia*, have responsibility for attacking drug-related crimes.

As a practical matter, my reading of *Von Raab* would probably authorize testing of all employees in the Criminal Division of the Justice Department, depending on its present organization, as well as employees in the criminal sections of the U.S. Attorney's offices and related bureaus and offices (including, of course, the Bureau of Prisons). The more difficult question for me is the permissibility of testing those employees in the criminal sections of other litigating divisions of the Department who are engaged in criminal investigation and prosecution, but *never* involved with drug-related crime. It could be argued that the government has a powerful interest in preventing drug use by all criminal-law-enforcement personnel, whether or not certain of such persons are ever involved in the fight against drug distribution. It might be thought that crime itself, like the

law, is a seamless web. Still, I do not think *Von Raab* can be stretched that far, although I am by no means confident of that. I therefore concur in the majority's refusal to authorize drug testing of employees (like those in the Antitrust or Civil Rights Division) who are not responsible for drug-related criminal investigations and prosecutions.

## II.

I disagree, however, with the majority's unwillingness to hold that drug warriors may be tested. What is characterized by the majority as judicial self-restraint, in my view, is really an impermissible exercise of judicial power: authorizing the continuance of an unlawful injunction without assuming the responsibility of justifying it. Refusing to decide the question presented, the majority purports to avoid reaching a constitutional issue. By allowing the injunction to continue, however, it has actually decided the question. Its position is not unlike permitting the execution of a prisoner while reserving the issue of whether capital punishment is constitutional. Perhaps the most important principle of judicial restraint governing the Anglo–American system is that judges are obliged to justify, in accordance with law, the exercise of—or the refusal to exercise—judicial power.

This case does not come to us on review of an agency regulation. Indeed, despite the majority's equating of the drug-testing program with a regulation, it was announced in a policy statement issued by the Attorney General, which was not issued as a declaration or interpretation of law. Accordingly, we are not reviewing the policy statement against administrative-law challenges. Appellees do not argue, for instance, that the policy statement was not adopted in accordance with proper procedures, that it is arbitrary and capricious because over- or under-inclusive, or that it is outside the Attorney General's statutory authority. The statement is relevant only

---

**2.** To be sure, there may be close cases among the plaintiffs or those similarly situated to a

plaintiff, *see infra* n. 3, but they are for the district court to resolve.

insofar as it manifests the undisputed intention of the Attorney General to test the named plaintiffs.[3] For purposes of the lawsuit that intention could just as well have been demonstrated by a speech by the Attorney General. (The case would be ripe in that event because the threat to an arguable constitutional right would be undisputed.) The majority's discussion of administrative-law principles is, therefore, quite irrelevant.[4] Its reliance on *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1942), in particular, is totally misplaced. The *Chenery* doctrine—that a court reviewing an agency action will not entertain arguments not relied upon by the agency—is designed, as we have recently recognized, to prevent judicial usurpation of future agency adjudication or regulatory policymaking. *See Women Involved in Farm Economics*, 876 F.2d 994, 998–1000, (1989) [hereinafter *"WIFE"*]. That concern is not implicated here.

The Attorney General's lawyers were entitled to make any arguments they wished in order to respond to the plaintiffs' challenge to the constitutionality of any application of his program. The Attorney General, for his part, never stated his reasons for believing his program constitutional when he announced it—nor was he obliged

to do so by any law. *See WIFE*, 876 F.2d at 998; *cf. Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1060 (5th Cir.1985); *Holy Cross Hosp.–Mission Hills v. Heckler*, 749 F.2d 1340, 1346 (9th Cir.1984). Of course, we rely on the government to explain its interest justifying the search involved in drug testing, but there is no legal barrier to that being done by the litigating lawyers. And although the argument the government presented in its post-*Von Raab* supplemental briefs sought to justify its entire program on the basis of, *inter alia*, the integrity rationale (not drawing a legal distinction between those engaged in drug prosecutions and those solely involved in prosecution of non-drug-related crimes), that litigating strategy is hardly surprising. It may even ultimately prevail. If we believe, as I do, that the government was partially correct, I see no legal grounds for our refusing to so acknowledge. The Supreme Court indicated in *Von Raab* that this is our responsibility: "it is appropriate to remand the case to the court of appeals for such proceedings as may be necessary to clarify the scope of th[e] category of employees subject to testing." 109 S.Ct. at 1397.

After oral argument, we dissolved the injunction as it related to presidential ap-

---

**3.** I do not think the injunction was properly extended to other than named plaintiffs. It is generally thought that nonparties may benefit from the granting of an injunction only "if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir.1987). *See also Professional Ass'n of College Educators v. El Paso County Community College District*, 730 F.2d 258, 273–74 (5th Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984); *Zepeda v. United States I.N.S.*, 753 F.2d 719, 728 n. 1 (9th Cir.1983); *id.* at 733–34 (dissenting opinion); *Gregory v. Litton Sys., Inc.*, 472 F.2d 631, 633–34 (9th Cir.1972). *But see Soto–Lopez v. New York City Civil Service Comm'n*, 840 F.2d 162, 168–69 (2d Cir.1988). And plaintiffs' claim is that they have a constitutional right not to be tested, not that they are somehow injured by the Department's testing of *other* employees. It is true, as the majority observes, Maj. op. at 496 n. 23, that the government did not challenge the scope of the injunction on appeal on the grounds that it extended beyond named plaintiffs. In light of the district court's broad view that the program was unconstitutional as ap-

plied to any employee, however, one can understand the Attorney General's reluctance to perform testing of other than named plaintiffs until he gained a reversal of the district court's declaration of constitutional law. After *Von Raab* the situation is quite different.

Injunctions against the government are perfectly appropriate when necessary to prevent harm to specific individuals. But we ought not forget that an injunction is the most powerful civil order available to the judiciary and should not be used merely as a device to shape desirable administrative action. "The District Court, exercising its equitable powers, is bound to give serious weight to the obviously disruptive effect which the grant of ... relief ... [i]s likely to have on the administrative process." *Sampson v. Murray*, 415 U.S. 61, 83, 94 S.Ct. 937, 949, 39 L.Ed.2d 166 (1974).

**4.** Even were this a case properly analyzed as an administrative-law challenge, the majority is in error, for the Administrative Procedure Act requires that "the reviewing court shall decide all relevant questions of law," 5 U.S.C. § 706, something the majority is unwilling to do.

pointees and employees whose duties include storing, maintaining and safeguarding controlled substances, because no plaintiffs fell within those categories. Accordingly, plaintiffs did not have standing to challenge drug testing of those employees. In modifying the injunction, we recognized that the Attorney General's "program" was not an undifferentiated whole. We held the rest of the case in abeyance until the Supreme Court decided *Skinner* and *Von Raab.* Now we conclude that the injunction must be vacated as it applies to those who have top-secret clearance. Again, therefore, the majority necessarily acknowledges that we must dissolve the injunction insofar as it is unauthorized by law—whether or not we have been told that the Attorney General intends to implement his program to the extent that we permit. The injunction, in my view, must be further modified insofar as it prevents drug testing of those Justice Department employees who are engaged in the investigation and prosecution of drug cases. "[A] court does not abdicate its power to revoke or modify its mandate if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong." *United States v. Swift & Co.,* 286 U.S. 106, 114–15, 52 S.Ct. 460, 462–463, 76 L.Ed. 999 (1932). Whether and how the Attorney General chooses to continue with the drug testing program—to the extent he legally can—is a policy matter for him to decide. But it is our responsibility to direct the district court to modify the injunction and thus to remove a judicial barrier which, in light of *Von Raab,* has proven to be improperly constructed. By so doing we would not even implicitly be suggesting that the Attorney General is *obliged* to test all employees that he may constitutionally test.

As I have explained, we are not reviewing the "plan" to determine whether it is arbitrarily over- or under-inclusive. I therefore understand neither the majority's suggestion that "DOJ, of course, remains free to promulgate new, narrower regula-

tions," Maj. op. at 495, nor its statement that "agency reformulation of its policy ... is the preferable next step," *id.* at 495. It would appear that the majority wishes the Attorney General to take an administrative action that he is under no legal obligation to perform: restructuring his program in accordance with a constitutional standard the majority is unwilling to define.[5] Furthermore, the majority suggests that the Attorney General's constitutional obligation is to draw the program's boundaries to encompass "federal prosecutors who could *plainly* be subjected to random testing." Maj. op. at 493 (emphasis added). Such a formulation implies that doubtful cases are to be resolved against the constitutionality of testing. I am aware of no legal authority that supports this proposition. That there may be close cases is all the more reason for the district court to follow governing law and consider those situations only insofar as *named plaintiffs* present them. *See supra* n. 3.

\* \* \* \* \* \*

The majority's opinion, at the very least, delays drug testing it is unwilling to declare unconstitutional. If the Executive Branch—presumably supported by Congress—is conducting a war against drugs, the majority's position, vis-a-vis the Executive Branch, strikes me as a form of judicial guerrilla warfare: placing a maximum number of impediments in the way of the Justice Department's program at minimum risk of Supreme Court review. With all due respect to my colleagues, I believe the approach they have adopted is an abuse of judicial power.

5. I take the majority, however, to leave the question open to the sound judgment of the district judge. Maj. op. at 495.