NATIONAL FEDERATION OF FEDERAL EMPLOYEES, AFL–CIO, et al., Plaintiffs,

v.

Richard B. CHENEY, et al., Defendants.

GRAPHIC COMMUNICATIONS INTERNATIONAL UNION, AFL–CIO, CLC, et al., Plaintiffs,

v.

Richard B. CHENEY, et al., Defendants.

Civ. A. Nos. 89–1727 (HHG), 89–1781 (HHG).

United States District Court, District of Columbia.

July 17, 1990.

---

See also 742 F.Supp. 1.

H. Stephan Gordon, Gen. Counsel, Alice L. Bodley, Deputy Gen. Counsel, Jeffrey Sumberg, Staff Atty., Nat. Federation of Federal Employees, Washington, D.C., for plaintiffs NFFE.

Mark D. Roth, Gen. Counsel, Joe Goldberg, Staff Counsel, American Federation of Government Employees, AFL–CIO, Washington, D.C., for plaintiffs AFGE.

Martin R. Ganzglass, Anton G. Hajjar, O'Donnell, Schwartz & Anderson, Washington, D.C., for plaintiffs Graphic Communications Intern. Union, AFL–CIO, CLC, et al.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Mary E.

Goetten, Shawn B. Jensen, Attys., Civ. Div., U.S. Dept. of Justice, Washington, D.C. (Gail Reinhart, General Counsel's Office, Washington, D.C., of counsel), for defendants.

## MEMORANDUM AND ORDER

HAROLD H. GREENE, District Judge.

Before the Court is plaintiffs' motion for summary judgment in a challenge to the constitutionality of so-called "reasonable suspicion" drug testing of employees of the Defense Mapping Agency (DMA). Under the agency's Drug–Free Workforce Plan, any employee may be required to undergo urinalysis testing upon a "reasonable suspicion" that he had used illegal drugs.[1] For the reasons stated below, plaintiffs' motion for summary judgment will be granted.

### I

On April 27, 1989, the Defense Mapping Agency adopted a Drug–Free Workforce Plan, an agency-wide program of testing for drug usage through urinalysis, drug abuse counseling, and education. Under the plan, employees holding secret or top-secret clearances are required to submit to random drug tests.[2] The plan also provides for testing of any DMA employee as long as there is a "reasonable suspicion" that he had used drugs.[3]

Under the plan, reasonable suspicion may be based, "among other things," upon: (1) observation of drug use or of physical symptoms of drug usage; (2) a pattern of abnormal conduct or erratic behavior; (3) the identification of an employee as the focus of a criminal investigation into drug possession, use or trafficking, or the arrest or conviction of an employee for a drug-related offense; (4) information provided by reliable and credible sources, or independently corroborated that an employee is using drugs; and (5) newly discovered evidence that the employees has tampered with a previous drug test. DMA Drug Testing Plan at 25. Plaintiffs have abandoned their challenge to the fifth category, and it will therefore be neither discussed herein nor enjoined.

### II

■ Defendants argue that it is of no legal significance that the testing program may be unconstitutional because the affected employee can initiate an action after-the-fact under 42 U.S.C. § 1983 for violations of his constitutional rights. Def.Mem. at 4–5. The argument is frivolous; no court has ever held that a government agency may engage in the wholesale violation of constitutional rights as long as there is the possibility of a subsequent damages action.

### III

■ The DMA plan violates the Fourth Amendment because it authorizes testing based on a suspicion of off-duty use in the absence of any indication of on-duty impairment.[4] See also, AFGE v. Sullivan, 744 F.Supp. 294, 303 (D.D.C.1990) (requiring a reasonable suspicion of on-duty drug use or impairment); Hartness v. Bush, 712 F.Supp. 986, 994 (D.D.C.1989) (same);

---

1. The plan is said to be designed to implement Executive Order 12564, published at 51 Fed.Reg. 32889 (Sept. 15, 1986). The Order directs the head of each Executive agency to establish drug testing programs and authorizes testing upon reasonable suspicion that the employee had used illegal drugs.

2. On January 19, 1990, this Court upheld random testing of employees of the Defense Mapping Agency with secret and top-secret security clearances, but enjoined suspicion testing because of concerns about its constitutionality. The Court also directed the parties to address (1) whether the agency's testing criteria sufficed to create reasonable suspicion and (2) whether they might be overbroad or imprecise.

3. Employees suspected of drug use or impairment are required to appear on short notice to produce a urine specimen. If a verified positive results, an employee must be disciplined—and may be fired—if he is unable to show that the test result is due to something other than illegal drug use.

4. This is, of course, not to say that urinalysis is itself constitutionally defective because it cannot distinguish between on-duty and off-duty drug usage—a contention rejected by the Court of Appeals in NFFE v. Cheney, 884 F.2d 603, 609 (D.C.Cir.1989).

*NTEU v. Lyng*, 706 F.Supp. 934, 948–50 (D.D.C.1988) (same).

 The Supreme Court has made it clear that mandatory drug testing of government employees requires a balancing of the employee's expectation of privacy against the government's interests at stake. *See Skinner v. RR Labor Executives Assoc.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *National Treasury Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). The government, as the employer, must prove special needs beyond the normal needs of law enforcement to justify testing its employees without a warrant or reasonable suspicion. *Von Raab*, 109 S.Ct. at 1390; *Skinner*, 109 S.Ct. at 1414. In *Skinner*, the Court upheld post-accident testing of train crews, on the basis of the existence of a compelling interest because a momentary lapse of attention by a member of a train crew could have disastrous consequences. Similarly, in *Von Raab*, the Customs agents being tested were directly involved in interdiction of illegal drugs, carried firearms on the job, or both.[5]

No such interests are at stake here, and defendants do not claim otherwise. DMA's suspicion plan applies to all agency employees regardless of the lack of sensitivity of their positions, their lack of access to classified materials, and their lack of involvement with transportation facilities. That being so, the agency has no greater interest in these employees' off-duty drug use which does not result in on-duty drug impairment than it does in illegal drug usage by any other member of society.

The DMA's basic defense of the testing notwithstanding that the origin of the suspicion may be off-duty use is that "while [the Plan's criteria] do not prove on-duty impairment, they certainly show that an employee is more *likely* to use drugs at work than an employee who does not meet those ... criteria." Memorandum at 7. However, in the absence of some compelling interest (other than merely the interest in keeping all government employees drug free), that standard is patently insufficient.

Moreover, it is implicit in the agency's use of standards which are not based on on-the-job impairment or on-the-job drug use that the individuals so identified do not exhibit on-the-job impairment or use. (Were it otherwise, these individuals would be identified without the need to resort to these standards.) The benefit that may be derived from uncovering individuals who show no on-the-job effects of drug use is far outweighed by the extraordinary intrusion into employees' privacy that the testing would cause, and it therefore cannot constitutionally be sustained.

## IV

 Plaintiffs argue that the criteria for reasonable suspicion are vague and overbroad. Defendants have failed to address the issue notwithstanding the Court's express request that they do so. *See* Mem. Order of January 19, 1990. Accordingly, the Court has no alternative but to conclude that the government has conceded the issue.

## V

In any event, the testing criteria are so unduly broad and ambiguous that they cannot pass muster under the Fourth Amendment. While the government's interest in assuring the integrity of its workforce is substantial, it is equally important that the testing criteria be narrowly tailored so as not to subject employees to unwarranted and unnecessary infringement of Fourth Amendment rights. These criteria are not so limited.

 1. The first criterion for testing is observable phenomena of drug use or symptoms of drug use. In implementation of that criterion, the agency has identified a list "not intended to be exhaustive" of symptoms of drug use, as follows. Symptoms of drug use include, among other

---

**5.** Likewise, *Harmon v. Thornburgh,* 878 F.2d 484 (D.C.Cir.1989), involved Justice Department lawyers with top-secret security clearances.

things, mood swings, attention lapses, increased heart rates, compulsive behavior, unusual appetite, drowsiness, anxiety, apathy, and confusion. Interrogatories 2–4.

These behaviors, of course, can have numerous other causes, ranging from strenuous exercise (elevated heart rate) to lack of sleep (drowsiness) to depression (apathy) to even too much coffee (anxiety). Many illnesses—the common flu, for one—will also cause such symptoms, and some of the behaviors, such as apathy and confusion, may stem from the conditions of employment. Since these are extremely common symptoms, those authorized to determine whether reasonable suspicion exists must be able distinguish between drug abuse and the effects of the host of everyday ailments that can likewise cause such symptoms.

Such a determination is difficult even for a physician. Scholl Dec. at ¶ 10. Under the testing plan, however, the determination is to be made by agency supervisors with little or no training in the diagnosis of drug abuse.[6] What training there is, is given by one Sydney Cooper, a DMA personnel specialist who apparently lacks a medical background, much less specialized training in drug abuse. The short of it is that supervisors will be making judgments for which they lack adequate training, experience, or education. There is simply no way for DMA supervisors to determine whether these symptoms result from drug abuse or the common cold or hayfever.[7]

■ 2. The second criterion for drug testing is a pattern of abnormal or erratic behavior. According to the plan, such behavior includes, among other things, long lunch breaks, Monday and Friday absences, absences before and after payday or a holiday, absences due to off-the-job injury, overreaction to criticism, spasmodic work pace, making increased personal telephone calls, and a preoccupation with personal problems. Response to Interrogatory 6.

This list appears to have nothing to do with drug abuse; rather it appears to be catalogue of symptoms of poor work habits, bad attitudes, or even bad luck. Nothing in defendants' filings explains why employees who make too many personal telephone calls may reasonably on that account be subjected to drug tests. Nor is there any appreciable link between drug use and over-sensitivity to criticism, preoccupation with personal problems, or erratic work habits. Likewise, it defies common sense to assert that an off-the-job injury is symptomatic of drug abuse. The proposition that long lunch breaks are indicia of drug abuse is nothing short of ludicrous; there are dozens of more likely reasons.

■ 3. The third criterion for drug testing is an arrest or a conviction for a drug-related offense or the identification of an employee as the focus of a criminal investigation into illegal drug possession. The problem with that criterion is that it is not limited to the recently arrested; instead, it applies any arrest or conviction, no matter how long ago. Consequently an employee who was arrested or convicted decades ago could now be required to undergo testing even if there is no evidence whatever of more recent usage, and he could be tested again and again since the prior arrest would always remain on the books. *AFGE v. Sullivan,* 744 F.Supp. 294, 304 (1990).

■ 4. The fourth criterion is information provided by reliable and credible sources or independently corroborated information. That test, too, fails for a variety of reasons. In the first place, the information may be comprised of the source's perceptions of same "symptoms" of drug abuse discussed *supra,* and it is invalid for

---

6. When an employee is suspected of drug use, a supervisor must obtain the concurrence of a second-line supervisor and then memorialize in writing the facts and circumstances that support his suspicion. Nothing more is required and no one with substantial training, education or practical experience in drug abuse, *e.g.* a physician, a law enforcement officer or a mental health professional, is involved in the decision.

7. Adding to the risk of error is the fact that the list, though lengthy and detailed, is not exclusive. DMA supervisors lack the training, experience or education that would allow them to reasonably conclude that a behavior not on the list was a symptom of drug abuse.

the same reasons. Moreover, nothing in the DMA's training program indicates or even suggests that the supervisors are equipped to determine what constitutes reliable and credible sources of information or independent corroboration. These supervisors are more likely to be skilled in cartography and geography than the difficult business of evaluating the credibility of informants. Finally, even a trained and experienced law enforcement officer's conclusions about the reliability of an informant must normally be reviewed by independent judicial authority before a search or other warrant can be issued. To be sure, the issue here does not concern the search of a home or an individual's person in connection with a possible criminal charge. But the intrusion into personal privacy detailed above and in such cases as *Bangert v. Hodel*, 705 F.Supp. 643 (D.D.C. 1989), is such that more than gossip must be required.

The burden is on the agency to redefine the criteria for reasonable suspicion, rather than on the Court to sift though the current overbroad and excessively vague criteria for those that might survive scrutiny. *Harmon v. Thornburgh*, 878 F.2d 484, 491, n. 10 (D.C.Cir.1989).

ORDERED that plaintiffs' motion for summary judgment as to the "reasonable suspicion" testing program be and it is hereby granted; and it is further

ORDERED that the defendants be and they are hereby enjoined from enforcement of defendants' "reasonable suspicion" testing program at the Defense Mapping Agency.