The GEORGIA ASSOCIATION OF EDU-
CATORS, Mary Smith, Richard
Schmidt, and H. Ed Martin, Jr., Plain-
tiffs,

v.

Joe Frank HARRIS, et al., Defendants.

No. 1:90–CV–1587–RHH.

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 19, 1990.

Amy Totenberg, Atlanta, Ga., Michael Evan Kramer, Decatur, Ga., for plaintiffs.

Michael J. Bowers, Atty. Gen. of Ga., for defendants.

## ORDER

ROBERT H. HALL, District Judge.

This case is before the court on plaintiff's request for: (1) a declaration that Georgia's Applicant Drug Screening Act and related implementing regulations are unconstitutional; and (2) a permanent injunction against the enforcement and implementation of the Applicant Drug Screening Act and related implementing regulations. The court GRANTS plaintiff's requests.

## INTRODUCTION

The individual plaintiffs are applicants for employment with the state of Georgia or one of its public school systems. Plaintiff Georgia Association of Educators is the union of Georgia public school teachers and allied education professionals. Defendants are officials of the state of Georgia, the state Board of Education, and the Board of Regents. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to enjoin defendants from enforcing and implementing the recently enacted Applicant Drug Screening Act and its implementing regulations. Plaintiffs also seek a declaration that the Act and its regulations violate their rights to privacy, due process and equal protection of the laws under the fourth and fourteenth amendments of the United States Constitution and parallel provisions of the Georgia Constitution. The court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331.

## BACKGROUND

In its 1990 Session, the Georgia General Assembly passed a number of bills aimed at combatting illegal drugs, all of which became effective July 1, 1990. As part of this package of bills, the General Assembly passed legislation requiring applicants for state employment to submit to urine tests for the presence of illegal drugs. Applicant Drug Screening Act, No. 1450, 1990 Georgia Laws 2064 (codified at O.C.G.A. § 45–20–110 through § 45–20–112). The Act provides in pertinent part:

Any applicant for state employment who refuses to submit to an established drug test for the use of illegal drugs or who shows a positive result from such test shall be disqualified from employment by the state or any public school system. Such disqualification shall not be removed for a period of two years from the date that such test was administered or offered, whichever is later. The State Personnel Board shall provide by rule and regulation for the administration of the test and any verification procedure. The results of such tests as to person deemed disqualified as a result (sic) shall

be confidential and shall not be a public record.

O.C.G.A. § 45–20–111.

Pursuant to the Act's mandate, the State Personnel Board issued implementing rules and regulations on June 28, 1990. One of these rules requires every candidate for state employment to report to a designated "sample collection facility" for urine testing "within two (2) business days of the time of being officially notified to so report." State Personnel Board Emergency Regulation 478–1.23, Preemployment Drug Screening ¶ 23.201.2. No applicant can begin work until he or she has submitted to drug screening and received a negative test result. *Id.* at ¶ 23.201.1. The state Board of Education and the Board of Regents soon issued similar regulations implementing the Applicant Drug Screening Act.

Prior to being informed of the applicant screening requirement, plaintiff H. Ed Martin, Jr. accepted a job as an attorney with the Georgia Department of Human Resources. He planned to begin work on July 23, 1990. On July 18, 1990, Martin received notice to appear for drug screening within two days as a precondition to his starting employment. Along with the other plaintiffs, Martin filed this action on July 19, 1990, seeking a temporary restraining order, as well as a preliminary and a permanent injunction, against enforcement of the Act and its implementing regulations. On July 20, 1990, this court held a hearing on the request for a temporary restraining order. At the close of the evidence, the court granted the restraining order, thereby relieving Martin of his obligation to submit to a urine test by the end of that afternoon.

After receiving additional briefs, the court held a hearing on plaintiffs' request for a preliminary injunction on August 16, 1990. At the beginning of the hearing, the parties agreed to consolidate the preliminary and final hearings such that the court's current order would be a final order fully disposing of this case. In their briefs and arguments, the parties addressed the constitutionality of the Act as written. At the court's request, they also addressed the question of whether the court could construe the Act in way to remedy its defects if it was in fact unconstitutional.

## ANALYSIS

### I. Constitutionality of the Act as Written

To begin, it is clear that Georgia's Applicant Drug Screening Act must comport with the fourth amendment to the United States Constitution. The fourth amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by government officials. U.S. Const. amend. IV. By virtue of the fourteenth amendment, the fourth amendment governs searches by state as well as federal government officials. *See, e.g., Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Moreover, the amendment is not limited to searches conducted for law enforcement purposes, but extends to all government searches, including those conducted by the government while acting as an employer. *O'Connor v. Ortega,* 480 U.S. 709, 715, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987). Finally, "[b]ecause it clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, ... these intrusions [are] searches under the Fourth Amendment." *Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989).

Whether a search or seizure is "reasonable" under the fourth amendment "depends on all the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985). Most often, particularly in criminal cases, "a search or seizure ... is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause." *Skinner,* 109 S.Ct. at 1414. In certain circumstances, however, " 'special needs, beyond the normal need for law enforcement, [may] make the warrant and probable-cause requirement impracticable.' " *Id.* (quoting *Griffin v. Wisconsin,*

483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987)). But "even a search that may be performed without a warrant must be based, as a general matter, on probable cause to believe that the person to be searched has violated the law." *Skinner*, 109 S.Ct. at 1416. This means that the government would have to show " 'some quantum of individualized suspicion' before [a court could] conclud[e] that a search is reasonable." *Id.* at 1417. Nevertheless, "a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable." *Id.* "[W]here a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989).

In *Von Raab*, the Supreme Court recognized that employee drug testing may "serve special governmental needs beyond the normal need for law enforcement." The Court accordingly applied the above balancing analysis to determine whether the United States Customs Service could constitutionally drug test certain of its agents without warrants or individualized suspicion.[1] The Customs Service's program made drug tests a condition of pro-

motion to jobs that entailed direct involvement in drug interdiction, use of firearms or access to classified information.[2] The Court's application of the balancing test was predicated on the Customs Service's concrete expression of substantial or compelling interests served by drug testing and a fact-specific explanation of how testing the subject employee groups furthered those interests.

On one hand, the Court found compelling the Customs Service's interest in "ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment." *Id.* 109 S.Ct. at 1393. The Court specifically explained how that compelling interest would be undermined by illegal drug use among front-line interdiction personnel. "A drug user's indifference to the Service's basic mission, or, even worse, his active complicity with malefactors, can facilitate importation of sizable drug shipments or block apprehension of dangerous criminals." *Id.* The Court also found compelling the Customs Service's interest in insuring the judgment and integrity of Customs Service agents carrying firearms. *Id.* The Court then discussed how illegal drug use by such agents would subvert the Customs Service's interest, explaining that "Customs employees who may use deadly force plainly 'discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have dangerous consequences.' " *Id.* (quoting *Skinner*, 109

---

**1.** The Court applied the same balancing test in *Skinner* to uphold Federal Railroad Administration (FRA) regulations that provided for suspicionless drug and alcohol testing of certain railroad employees immediately following serious train accidents. *See Skinner*, 109 S.Ct. at 1418–1419. The Court found compelling the government's interest in testing the designated employees because they "discharge[d] duties fraught with such risks of injury to others that even a momentary lapse of attention [could] have disastrous consequences." *Id.* at 1419. The Court also relied on the FRA's showing that drug and alcohol abuse was a "significant problem in the railroad industry" and that a number of serious accidents resulted therefrom. *Id.* at 1407–08. On balance, the Court noted that the covered employees enjoyed a diminished privacy interest because their job performance had "long

been a principal focus of regulatory concern." *Id.* at 1419.

**2.** Plaintiffs correctly argue that the *Von Raab* Court did not establish three types of governmental interest—workforce integrity (based on the "front-line" agents duties to protect the Nation's borders), public safety and protection of classified information—as compelling in all circumstances. Rather, it was the Customs Service that articulated these categories of governmental interest. In applying the regular fourth amendment balancing test, the Court simply accepted these interests as sufficiently compelling to justify testing employees who sought transfer to jobs that specifically implicated these interests.

S.Ct. at 1419).[3]

On the other hand, the court weighed the applicants' fourth amendment privacy interests, noting that these particular applicants for promotion enjoyed a diminished expectation of privacy because of their specific job duties.

> Unlike most private citizens or government employees in general, employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity. Much the same is true of employees who are required to carry firearms. Because successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from the Service personal information that bears directly on their fitness.

*Von Raab,* 109 S.Ct. at 1394. Upon balancing these competing interests, the Court concluded that the Customs Service's suspicionless drug testing program was reasonable under the fourth amendment. The Court found that "[t]he Government's compelling interest in preventing the promotion of drug users to positions where they might endanger the integrity of our Nation's borders or the life of the citizenry outweigh the [diminished] privacy interests

of those who seek promotion to those positions." *Id.*

▮ Certainly, the *Von Raab* approach governs this case. The fact that the Applicant Drug Screening Act mandates urinalysis in the absence of search warrants or individualized suspicion does not make it unconstitutional. Rather, its constitutionality depends on application of the balancing test used in *Von Raab.*[4] The court finds it difficult to even begin applying that balancing test, however, because defendants have failed to specifically identify any governmental interest that is sufficiently compelling to justify testing *all* job applicants. Moreover, defendants remain oblivious to *Von Raab*'s (and indeed, the fourth amendment's) requirement that it connect its interest in testing to the particular job duties of the applicants it wishes to test. Instead, defendants attempt to justify their comprehensive drug testing program based on a generalized governmental interest in maintaining a drug-free workplace. Defendants' position is untenable because neither *Von Raab* nor its progeny recognize such a generalized interest as sufficiently compelling to outweigh an individual's fourth amendment rights.[5]

3. The Court was "unable, on the [existing] record, to assess the reasonableness of the Government's testing program insofar as it cover[ed] employees who are required to handle classified material." *Von Raab,* 109 S.Ct. at 1396. Although the Court recognized that it would be reasonable for the Customs Service to test employees who had genuine access to "sensitive information," it was concerned that the Customs Service's testing directive may have encompassed a number of employee groups that did not actually have such access. *Id.* at 1396–97. In other words, the Customs Service failed to specifically link its interest in protecting classified information to the particular job duties of the agents it sought to test. The Court therefore remanded the "classified material" issue to the court of appeals to "examine the criteria used by the Service in determining what materials are classified and in deciding whom to test under this rubric." *Id.* at 1397.

4. Defendants ignore the *Von Raab* analysis in their brief and instead focus on *Michigan Dep't. of State Police v. Sitz,* — U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), in which the Supreme Court applied a more lenient balancing test to uphold the state of Michigan's use of highway sobriety checkpoints. However, the

test applied in *Sitz* (which was first articulated in *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)) is unique to "cases dealing with police stops of motorists on public highways" and has no application to cases involving far more intrusive searches and seizures such as urinalysis. *Sitz,* 110 S.Ct. at 2485. Indeed, the *Sitz* court expressly noted that its analysis covered only initial highway stops, and that "[d]etention of particular motorists for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard." *Id.*

5. Defendants argue that plaintiffs and other job applicants have a diminished expectation of privacy under the fourth amendment as compared to existing employees. Even if this argument is correct, it does not relieve defendants of their obligation to articulate a substantial governmental interest served by testing *all* job applicants. Because defendants have failed to articulate such an interest, their side of the balancing scale is empty, and even if plaintiffs' fourth amendment interests are "lighter" than those of existing employees, they are undoubtedly "heavy" enough to prevail here.

As noted *supra,* the Customs Service's regulations upheld in *Von Raab* applied only to specific classes of employees, and the Supreme Court expressly distinguished these employees from "most private citizens or *government employees in general.*" *Von Raab,* 109 S.Ct. at 1394 (emphasis added). Guided by this distinction, cases applying *Von Raab* have not accepted boundless invocations of "workforce integrity" as a ground for testing all government employees. Instead, they have insisted that the government demonstrate a "clear, direct nexus ... between the nature of the employee's duty and the nature of the feared violation." *Harmon v. Thornburgh,* 878 F.2d 484, 490 (D.C.Cir.1989), *cert. denied sub nom. Bell v. Thornburgh,* — U.S. ——, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990).

In *Harmon,* for example, the United States Department of Justice sought to justify its random drug testing program based on the same generalized, drug-free workplace rationale that defendants assert today. The court swiftly rejected such reasoning. "Certainly, that theory finds no support in *Von Raab.* ... [Although] the government has a legitimate interest in ensuring that its employees obey the law, ... that interest is not sufficiently compelling to justify a search. *Von Raab,* it seems to us, suggests that federal employment alone is not a sufficient predicate for mandatory urinalysis." *Id.* at 490.[6] In *Taylor v. O'Grady,* 888 F.2d 1189 (7th Cir. 1989), the Seventh Circuit similarly recognized that "[a] generalized interest in the integrity of the work force ... is not enough to overcome the privacy interests at issue." *Id.* at 1196. The court based its statement not only on the express language of *Von Raab* but also on the fact that the Supreme Court remanded the por-

tion of *Von Raab* dealing with access to classified information. "This remand would have been superfluous if all government employees could be subject to mandatory testing based on the integrity rationale." *Id.* Because this oft-rejected "integrity rationale" is all that defendants offer to support the Applicant Drug Screening Act, the court has no choice but to find it in violation of the fourth and fourteenth amendments of the United States Constitution.[7]

In addition, the court finds defendants' numerous references to the practices of private-sector employers irrelevant. Because private-sector employers are permitted to drug test their employees, defendants argue, the state of Georgia will become a "dumping ground" for drug addicts if it cannot do the same. Unlike private-sector employers, however, the state of Georgia and its subdivisions must comply with the fourth amendment, and as discussed *supra,* enforcement of the Applicant Drug Screening Act would make such compliance impossible.

## II. Alternative Constructions of the Act

■ Even if the Act is unconstitutional as written, defendants argue that the court should construe it narrowly to mandate drug screening only for those applicants who could be tested without violating the fourth amendment. The court declines defendants' invitation to re-write the Act in that fashion. Before explaining its conclusion, however, the court notes that defendants are free to drug test job applicants *as permitted by the balancing analysis set forth in Von Raab* without regard to the Applicant Drug Screening Act. Therefore, by declaring the Act unconstitutional

6. The *Harmon* court also rejected the Justice Department's attempt to create a compelling governmental interest out of a generic desire to protect "public safety." The court focused on the specific job duties of Justice Department employees, noting that the "indirect risk" to public safety caused by a Justice Department lawyer's drug-induced blunder "is wholly different from the risk posed by a worker who carries a gun or operates a train." *Harmon,* 878 F.2d at 491. The court concluded that such a non-im-

mediate threat provided no basis for overriding an employee's fourth amendment rights. *Id.*

7. The Act is plainly unconstitutional because it violates plaintiffs' rights to privacy under the fourth and fourteenth amendments of the United States Constitution. The court therefore need not decide whether the Act is unconstitutional on any of the additional grounds urged by plaintiffs.

and declining to give it an alternative, "saving" construction, the court is not forbidding defendants from drug testing those job applicants whom they are constitutionally permitted to test. Rather, the court is only saying that defendants may not conduct those tests pursuant to the Applicant Drug Screening Act.

There are two general methods the court could use to "save" the Applicant Drug Screening Act. First, the court could devise a "saving" or "authoritative" construction of the Act in order to bring it into compliance with the fourth amendment. Second, pursuant to the principle of severance, the court could "sever" any unconstitutional portion of the Act and leave the remaining portion standing. Neither of these methods are appropriate in this case.

### A. Saving or Authoritative Construction

■ Defendants argue that the court could construe the Act in a "saving" or "authoritative" manner by interpreting the term "Any applicant ..." not to mean all applicants but rather to mean only those applicants who could be tested under *Von Raab*. The court disagrees, because it could not render such a construction without completely re-writing the Act and usurping the authority of the Georgia General Assembly.

"[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Here, both the language of the Act and the available evidence of legislative intent indicate that the Act requires drug screening of *all* applicants. With regard to the language of the Act itself, the term "any" may ordinarily be used to mean "every" or "all." Black's Law Dictionary 86 (5th ed. 1979). The court finds that definition particularly appropriate in this case. If "any" was read to mean "one out of many" or "some," the Act would be incomplete be-

cause it fails to identify the person or entity that would have discretion to determine which applicants should be tested. It also fails to set forth any criteria for the exercise of such discretion consistent with *Von Raab*. Even more importantly, if given that "limited" reading, the Act would still, in certain situations, make drug screening a prerequisite for jobs for which the state cannot test. The Act bars those applicants who test positive for illegal drugs or refuse to submit to urinalysis from "employment by the state or any public school system." Therefore, if an applicant refused to be tested when seeking a position for which testing was allowed, the Act would still bar the applicant from the many state jobs for which testing is not allowed. Defendants' proposed reading of the Act thus not only fails to cure its constitutional defect, but also renders the Act internally inconsistent. *See Shell Oil Co. v. Iowa Department of Revenue*, 488 U.S. 19, 25, 109 S.Ct. 278, 281, 102 L.Ed.2d 186 (1988) (meaning of words in statute depends on their context).

The available evidence of legislative intent further indicates that the Act cannot be read to require the testing of fewer than all job applicants. To begin, another statute enacted as part of the legislature's anti-drug package indicates that if the Georgia General Assembly intended to limit the Applicant Drug Screening Act to fewer than all applicants it would have expressly done so. That statute provides for random drug testing of state employees who perform "high risk work" as determined by their relevant agency or department heads. O.C.G.A. § 45–20–111. Additionally, Georgia's Attorney General has opined, both officially and unofficially, that "[i]t is clear that the General Assembly did not intend to allow public employers to exercise any discretion to exclude any applicants from pre-employment drug testing. The applicant testing law is mandatory for all applicants employed on or after July 1, 1990." Letter from Michael J. Bowers, Attorney General, to E. Freeman Leverett, June 26, 1990; *see also* Attorney General Opinion, June 15, 1990; Unofficial Attorney General Opinion, June 22, 1990. The Emergency Regulations issued by the State Per-

sonnel Board also require all job applicants to submit to drug tests. *See* State Personnel Board Emergency Regulation 478–1–.23, Preemployment Drug Screening ¶ 23.101(A), 23.201.1. The court notes that "[t]he interpretation of the agency that is charged with the responsibility of implementing the statute is generally accorded significant weight." *Continental Can Co., Inc. v. Mellon*, 825 F.2d 308, 311 (11th Cir.1987).

Finally, even if the court ignored the plain language of the Act as well as the General Assembly's intent that it cover all job applicants, reading it to cover only those applicants who can be tested under *Von Raab* would involve the court in distinctly legislative decisionmaking. More specifically, the court would have to either delegate the authority to identify "testable" employment positions to some executive body or identify those positions itself. In either case, the court would be acting far beyond the reaches of its constitutional role and its functional expertise.

Defendants urge the court to simply delegate the power to identify those applicants who could be tested to "the various State department heads and other hiring authorities." Defendants' Brief at 20. But defendants provide no guidance as to how the court should achieve this result and the record is devoid of any evidence that the General Assembly would have approved it. The court would be stepping even further into the legislative realm if it took upon itself the task of choosing which job applicants could be tested under *Von Raab*. The court would have to evaluate the currently unarticulated governmental interests in testing applicants for all of the numerous employment positions offered by state agencies, boards and commissions, Regent's colleges and universities and local public school systems. By determining *de novo* which groups of employees could be tested, the court

> would be drawing a line which the [legislature or] agency itself has never drawn. Moreover, that line would not be self-defining: the ... court would be compelled to hear evidence and arguments, and then to determine which individual em-

ployees [could be tested. It would be] more appropriate [for] any such determination [to] be made and [for] subsequent identification criteria [to] be formulated as an initial matter by the [legislature or] agency rather than by the court.

*Harmon*, 878 F.2d at 495.

*B. Severance*

 Since the court cannot construe the Act to comport with *Von Raab*, it could "save" it only by applying the principle of severance. According to that principle, "whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of th[e] court to so declare, and to maintain the act in so far as it is valid." *Regan v. Time, Inc.*, 468 U.S. 641, 652, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984) (plurality opinion) (quoting *El Paso & Northeastern Railroad Co. v. Gutierrez*, 215 U.S. 87, 96, 30 S.Ct. 21, 24, 54 L.Ed. 106 (1909)). By definition, however, this principle is meaningful only if the unobjectionable portion of the statute "is fully operative as a law." *Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (per curiam) (quoting *Champlin Refining Co. v. Corporation Commission of Oklahoma*, 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932)); *see also Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987) ("Congress could not have intended a constitutionally flawed provision to be severed from the remainder of the statute if the balance of the legislation is incapable of functioning independently.").

The principle of severance is inapplicable to the Applicant Drug Screening Act because once the flawed provision is excised, the remainder of the Act cannot function as a law. As described *supra*, the central (and unconstitutional) provision of the Act provides that:

> Any applicant for state employment who refuses to submit to an established test for the use of illegal drugs or who shows a positive result from such test shall be disqualified from employment by the state or any public school system.

O.C.G.A. § 45–20–111. The Act contains only two other sections, one providing definitions (O.C.G.A. § 45–20–110) and another authorizing local boards of education to require applicants to pay the cost of their drug tests (O.C.G.A. § 45–20–112). Certainly, neither of those sections retain any operative force in the absence of section 45–20–111. Moreover, the court could sever no word, clause or phrase from section 45–20–111 to render the remainder of that section constitutional. The statute simply cannot be severed.

Georgia's severability statute, found at O.C.G.A. § 1–1–3, does not change this result. The severability statute simply creates a presumption that if "any part ... of th[e Georgia] Code or ... any Act or resolution of the General Assembly is declared or adjudged unconstitutional, such declaration or adjudication shall not affect the remaining portions of th[e] Code or of such Act or resolution." O.C.G.A. § 1–1–3. The severability statute " 'in no way alters the rule that in order to hold one part of a statute unconstitutional and uphold another part as separable, they must not be mutually dependent upon each other.' " *City Council of Augusta v. Mangelly*, 243 Ga. 358, 363, 254 S.E.2d 315 (1979) (per curiam) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 313, 56 S.Ct. 855, 874, 80 L.Ed. 1160 (1936)).

In sum, the court cannot "save" the Act. Even if it had the authority to craft an "authoritative" construction of the Act, to do so would contravene legislative intent and usurp legislative prerogative. The court cannot sever the offending portion of the Act because it is inextricably woven into the whole. Nevertheless, the court does not hold that the state or any of its subdivisions cannot drug test those job applicants who could be tested under *Von Raab*. Such applicants might include those seeking positions directly involved in the "front lines" of drug interdiction or requiring the use of firearms. Defendants are also free to drug test state employees as authorized by the reasoning of *Skinner*. *See supra* n. 1. The court holds only that defendants cannot conduct drug tests un-

der the authority of the unconstitutional Applicant Drug Screening Act.

### CONCLUSION

The court GRANTS plaintiff's request for a permanent injunction and strikes the Applicant Drug Screening Act as unconstitutional.

So ORDERED.