BARKETT, Circuit Judge, dissenting:

As the majority recognizes, there is no question that the mandatory drug testing in this case is an unreasonable search prohibited by the Fourth Amendment <u>unless</u> it is required by "special governmental needs beyond the normal need for law enforcement," <u>and</u> those needs outweigh the candidates' privacy interests.  <u>National Treasury Employees v. Von Raab</u>, 489 U.S. 656, 665-66, 109 S.Ct. 1384, 1390-91 (1989) (citing <u>Skinner v. Railway Labor Executives' Ass'n</u>, 489 U.S. 602, 109 S.Ct. 1401, 1413-14 (1989)).  I dissent because I do not believe that the suspicionless search in these circumstances serves any special governmental need beyond the normal need for law enforcement, and, if it did, I believe that the candidates' privacy interests outweigh the governmental interests when the factors of <u>Von Raab</u> are properly considered.

Before balancing the candidates' privacy expectations against the government's interests in conducting suspicionless drug-screening, the court must first ascertain whether this case presents a special governmental need beyond the normal need for law enforcement.[1]  In simpler terms, before the court can balance the competing interests in this case, it must first ask what is so impractical about requiring a warrant or individualized suspicion in the circumstances presented here.  It

_____

[1]  Whether "[s]pecial needs are involved" in this case is determined not by how urine test results will be used against any particular candidate, but by whether the "need" for such testing is <u>already</u> served by ordinary law enforcement, and is of such a "special" nature as to render the Fourth Amendment's warrant requirement  impracticable.

is in this threshold inquiry that I believe the majority first errs.

The majority frames its analysis in terms of whether "unlawful drug use is . . . fundamentally incompatible with high state office."  Certainly, the answer to that question is patently obvious, but the question <u>assumes</u> unlawful drug use.[2] This case is not about the incompatibility of drug use and elected office, but rather about whether Fourth Amendment protections can be constitutionally suspended when there is no individualized suspicion, when there is no immediate or direct threat to public safety, when those being searched are not directly involved in the frontlines of drug interdiction, when there is no institutional setting involved such as a prison or public school requiring swift and informal discipline, and when there are no dire consequences as a result of waiting to obtain a warrant if a candidate, or anyone else for that matter, is suspected of violating the law.  The first question for the court is <u>not</u> whether the state's interest is great enough and its chosen method effective enough to outweigh the privacy interests involved.  Rather, it is whether, under <u>Von Raab</u>, the circumstances in this case give rise to a <u>special</u> governmental need beyond the ordinary needs of law enforcement in the first place.  I think not, and the majority's analysis does not support

_____

[2]     O.C.G.A. § 21-2-140 bars from public office either candidates who refuse to take the test because they are ideologically opposed to the government's intrusion upon their privacy, or candidates who fail the test and are thereby only <u>suspected</u> of having committed a crime.

2

its conclusion to the contrary.[3]

Essentially, the majority's justification for suspending the requirements of the Fourth Amendment is the state's interest in officeholders who are "drug free," "honest[ ], clear-sighted[ ], and clear-thinking," as well as "appreciative of the perils of drug use" and "[]sympathetic to drug interdiction efforts." Putting aside First Amendment concerns as to whether these subjective traits, as desirable as they may be, can be legislated as valid qualifications for public office, this standard not only fails to address why ordinary law enforcement methods are insufficient to protect these interests, but it makes suspicionless searches the rule and obtaining a warrant almost always irrelevant.[4] Moreover, this rationale seriously erodes the Fourth Amendment's protections for many people beyond the parties involved here.

The Supreme Court has rejected such an overbroad standard in assessing the reasonableness of various governmental drug-testing schemes. In Skinner and Von Raab, the Court suspended Fourth Amendment protections only when the risks of drug impairment

---

[3]    The majority's reference to the Tenth Amendment interest in setting qualifications for public office misses the point. Georgia's power under the Tenth Amendment to regulate its electoral process is not absolute. As the majority notes, the state's power to do so is subject to federal constitutional limitations, the extent of which are at issue here.

[4]    Under this standard, what Fourth Amendment protections would candidates retain to prevent suspicionless testing to research for a physical or mental impairment, AIDS, alcohol or prescription drug abuse, screening DNA for genetic information, or to prevent warrantless invasions of homes to search for drugs, pornography, or other contraband?

3

affected those directly on the frontline of drug interdiction efforts, or those who, if under the influence of drugs, could pose an imminent physical threat to the public. The Court found a nexus between the risks of drug use and imminent hazards to public safety, for example, where government employees "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." Skinner, 489 U.S. at 628, 109 S.Ct. at 1419. The Court held that railway safety is a special governmental need beyond the normal need for law enforcement and justifies the suspicionless urine testing of those employees whose drug and alcohol abuse can "cause great human loss," but noted that the regulations "narrowly and specifically" limited testing to the aftermath of a serious accident when individualized suspicion is "most impracticable," or when employees are otherwise directly involved in safety-rules violations. Id. at 622, 631, 109 S.Ct. at 1416, 1420-21. Moreover, the Court upheld drug testing only after a showing of past history linking drug and alcohol abuse with serious train accidents. Id. at 606-08, 109 S.Ct. at 1407-08.

In Von Raab, the Court likewise required such a nexus in upholding suspicionless urine testing of Customs employees who are involved directly in enforcing drug laws, or are required to carry firearms. Von Raab, 489 U.S. at 670-71, 109 S.Ct. at 1393. While the Court found compelling the Customs Service's interest in "ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment,"

4

it also specifically explained how that compelling interest would be undermined by unlawful drug use among such front-line personnel:  "A drug user's indifference to the Service's basic mission, or, even worse, his active complicity with malefactors, can facilitate importation of sizable drug shipments or block apprehension of dangerous criminals."  Von Raab, 489 U.S. at 670, 109 S.Ct. at 1393.  The Court recognized that "the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force."  Id. at 671, 109 S.Ct. at 1393 (emphasis added).

The narrow focus of these exceptions was reaffirmed in Vernonia School District 47J v. Acton, ___ U.S. ___, 115 S.Ct. 2386 (1995).  The Court held that special governmental needs justify randomly testing the urine of schoolchildren, who hold a diminished expectation of privacy in the public school custodial setting, but noted that "it must not be lost sight of that this program is directed more narrowly to drug use by school athletes, where the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high."  Acton, 115 S.Ct. at 2395 (emphasis added).  Thus, it appears that even (unathletic) schoolchildren enjoy greater Fourth Amendment protections than the majority accords the candidates in this case.

There is nothing so special or immediate about the generalized governmental interests involved here as to warrant

5

suspension of the Fourth Amendment's requirement of individualized suspicion for searches and seizures.  There are no exigent circumstances.  There is no imminent threat of grave physical harm.  The prospective candidates are not on the frontlines of drug interdiction.  And, we cannot ignore that candidates are subjected to the ultimate screening program--the voice of the electorate.  Thus, I believe the majority errs in concluding that a special governmental need beyond the normal need of law enforcement is present in this case.

In addition to being troubled by the majority's assumption that a special governmental need beyond the normal need for law enforcement exists which makes obtaining a warrant impractical in this case, I am troubled by the majority's assessment and balancing of the competing interests involved.  This case presents a more serious constitutional question than that in  Von Raab and Skinner because of the nature and magnitude of the individual rights involved.

Even if privacy interests are viewed in the narrowest sense, a candidate's legitimate expectation of privacy in his or her bodily fluids is greater than the employees in Von Raab or Skinner.  In balancing the privacy interests of the employees in Von Raab, the Court recognized that Customs officers already agree to undergo intrusive screening as a condition of employment:  "Unlike most private citizens or government employees in general, employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and

6

probity." Von Raab, 489 U.S. at 672, 109 S.Ct. at 1394 (emphasis added). The Court likened the necessity in those circumstances to the "extraordinary assurances of trustworthiness and probity" and "intrusive inquiries into . . . physical fitness" required of those who undertake "special positions" such as in our military or intelligence services. Id. at 671, 109 S.Ct. at 1394. In Skinner, the Court likewise recognized that "the expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." Skinner, 489 U.S. at 627, 109 S.Ct. at 1418.

I recognize that employment choices may indeed diminish expectations of privacy. An individual need not choose to become a drug interdiction agent, military intelligence officer, or railway engineer, thereby avoiding the intensive training and intrusive screening required by that particular job. But, an individual does not have a constitutional right to a specific kind of employment. The Constitution, however, protects participation in government. While candidates relinquish to the people a great deal of their privacy in choosing to run for public office, the price should not include sacrificing one's Fourth Amendment right to be free from unreasonable searches and seizures.

In conducting the Von Raab balancing test, the majority fails to adequately consider the totality of the government's

7

"interference with individual liberty." Von Raab, 489 U.S. at 671, 109 S.Ct. at 1393. Not only is the privacy surrounding an individual's bodily functions at stake, but all of the rights associated with participating in a democracy--rights of association, freedom of speech, ballot access, and the right to cast an effective ballot. We are not dealing merely with the denial of a job opportunity, but with the denial of opportunity to participate in our democratic form of government. In light of the interference with these liberty interests, giving the governmental interests here the greater weight seems especially unreasonable.

Finally, I am concerned about the majority's conclusion that the government's actions in this case do not violate the First Amendment. The majority maintains that the government's purpose is not suppression of free expression. Yet, it supports its holding by citing the importance of ensuring that elected officials are "persons appreciative of the perils of drug use" and "[]sympathetic to drug interdiction efforts." Establishing a certain ideology as a "qualification" for holding public office appears to be a content-based restriction on free expression.[5]

---

[5] The Supreme Court struck down a previous attempt by the Georgia legislature to disqualify a citizen from public office on the basis of his ideology, noting that: "Madison and Hamilton anticipated the oppressive effect on freedom of expression which would result if the legislature could utilize its power of judging qualifications to pass judgment on a legislator's political views." Bond v. Floyd, 385 U.S. 116, 135-37 n.13, 87 S.Ct. 339, 349-50 n.13 (1966) (holding legislature's use of oath provisions to exclude from its ranks one with whom its majority disagreed on federal government's policy in Vietnam War violated First Amendment).

8

Drug policy is a politically charged issue confronting many government officials who have disparate points of view regarding the "Drug War" and the efficacy of the means employed in fighting it.  It is the function of public office holders to write, enforce, and interpret the laws, including drug laws.  By conditioning holding public office upon submission to drug screening, however, the Georgia legislature effectively bans from positions of political power not only those candidates who might disagree with the current policy criminalizing drug use, but also those who challenge the intrusive governmental means to detect such use among its citizenry. This statute is neither neutral nor procedural, but, in the majority's own characterization, attempts to ensure that only candidates with a certain point of view qualify for public office.

It is beyond peradventure that a bodily search is significantly intrusive.  It is almost equally obvious that the means utilized here would not accomplish the goals purportedly justifying the search.[6]  Thus, this search is more a symbolic gesture  than an effective tool to ferret out drug-users or assure exemplary public officials.[7]  Surely, symbolic gestures

---

[6]    The majority recognizes that, considering the notice given, any drug user could disguise drug use, and that "[p]ersons who would be caught by Georgia's limited testing would seem to be people who are out of control about drugs . . . ."  It also seems that these "worst cases" would be ideal candidates for some form of individualized suspicion.

[7]    The majority has delineated the government's purported interest in ensuring that candidates "have what it takes" to hold public office as justification for the suspicionless urine

testing of candidates.  However, the available subsequent legislative history indicates that in passing O.C.G.A. §§ 21-2-140, the Georgia General Assembly did not appear to be motivated by concerns that state politicians exercise their "best judgment and skill," but rather by the desire to enact a symbolic measure:

> "One of the sponsor's of the original 1990 legislation . . . proposed the legislation out of a sense of fairness rather than any genuine fear that state politicians were not drug free.  The sponsor of the 1990 legislation felt that if city council or state politicians require drug testing of state employees, they too should undergo drug testing.  Additionally, if in order to appease public concern about the use of illegal drugs politicians must infringe upon the rights of government employees, the politicians themselves should be treated similarly."

Edith M. Shine, Legislative Review, 9 Ga. St. U. L. Rev. 212, 218 (1992) (citing Telephone Interview with Rep. Bob Holmes, House District No. 28 (Apr. 10, 1992)) (footnotes omitted).  Representative Holmes stated that the legislation was proposed in response to similar legislation that required school teachers to undergo urine testing because it was unfair to subject teachers to urine tests unless the politicians enacting such a law also were tested.   Id. at 218 n.61.  Nonetheless, the law did not apply to politicians who were already in office, but only to prospective candidates for those offices.  In any event, the Applicant Drug Screening Act, which precipitated the mandate for suspicionless testing of political candidates, was struck down later as an unconstitutional infringement of employment applicants' Fourth and Fourteenth Amendment rights.  Georgia Ass'n of Educators v. Harris, 749 F.Supp. 1110, 1114 (N.D. Ga. 1990) (holding generalized governmental interest in maintaining drug-free workplace not sufficiently compelling so as to outweigh applicants' Fourth Amendment rights).

On a final note, Representative Holmes' comments are incapable of "chang[ing] the legislative intent . . . expressed before the Act's passage," as in Blanchette v. Connecticut General Insurance Corps., 419 U.S. 130, 132, 95 S.Ct. 335, 353 (1974) because, as the majority notes, no "official" history of legislative intent exists.  Rather, this case is closer to Galvan v. Press, 347 U.S. 522, 526-27, 74 S.Ct. 737, 740 (1954) (relying on 1951 memorandum by Senator McCarran in interpreting ambiguous legislative intent of 1950 statute he sponsored).  We are left, therefore, with the wisdom of Mr. Chief Justice John Marshall that "[w]here the mind labours to discover the design of the legislature, it seizes everything from which aid can be derived." United States v. Fisher, 2 Cranch 358, 386, 2 L.Ed. 304 (1805) (quoted in Consumer Product Safety Commission v. GTE Sylvania,

are not enough to trump the constitutional imperatives of the Fourth Amendment or the right to participate in government.

---

Inc., 447 U.S. 102, 100 S.Ct. 2051 (1980)).